# SEALED

RICHARD E. SIMPSON
ROBERT I. DODGE
GERALD W. HODGKINS
GREGORY G. FARAGASSO
DANETTE R. EDWARDS
THOMAS C. SWIERS
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-4492 (Simpson)
simpsonr@sec.gov
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

2013 SEP 11 A 9:40

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 2:13-cv-01658-JCM-CWH |
| Plaintiff, | |
| v. | |
| EDWIN YOSHIHIRO FUJINAGA and MRI INTERNATIONAL, INC., | |
| Defendants, | |
| and | |
| CSA SERVICE CENTER, LLC, | |
| Relief Defendant. | |

**COMPLAINT FOR INJUNCTIVE RELIEF, DISGORGEMENT, PENALTIES, AND OTHER RELIEF FOR VIOLATIONS OF THE <u>FEDERAL SECURITIES LAWS AND DEMAND FOR JURY TRIAL</u>**

**(Filed Under Seal)**

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Section 20(b) and (c) of the Securities Act of 1933 (the "Securities Act") and Sections 21(d) and (e) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 77t(b) & (c), 78u(d) & (e), 78aa]. The defendants made use of the means or instruments of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with their acts, transactions, practices and courses of business alleged in this Complaint.

2.     Venue lies in the District of Nevada pursuant to Securities Act Section 22(a) and Exchange Act Section 27 [15 U.S.C. §§ 77v(a), 78aa] because certain of the acts, practices and courses of business constituting the violations described in this Complaint occurred in this District and one or more of the defendants are inhabitants of this District.

## SUMMARY OF ALLEGATIONS

3.     The defendants, Edwin Yoshihiro Fujinaga ("Fujinaga") and MRI International, Inc. ("MRI") perpetrated an extensive and egregious Ponzi scheme that victimized thousands of investors, depriving many of their entire life savings. From October 1998 through May 2013, MRI received over $800 million from investors.

4.     MRI purported to be in the business of buying medical accounts receivable ("MARS") that medical providers in the United States held against insurance companies. Fujinaga and MRI represented that the company used investors' money to buy MARS from medical providers at a discount and tried to recover the full value of the MARS from the insurance companies. Fujinaga and MRI represented that they used investor money solely and exclusively to buy MARS.

2

5. In reality, MRI was a fraudulent Ponzi scheme designed to misappropriate money from investors. Fujinaga and MRI used investor money to pay the principal and interest due to earlier investors. In addition, Fujinaga transferred investor money to: (1) MRI operating accounts, where it was used to pay for general operating expenses, instead of MARS; (2) other entities owned by Fujinaga that were not in the business of collecting MARS; and (3) a company owned by Fujinaga -- The Factoring Company -- which paid Fujinaga's credit card bills, alimony and child support, and bought luxury cars for him. Relief defendant CSA Service Center, LLC, which is affiliated with MRI and controlled by Fujinaga, is the nominal owner of the homes that Fujinaga occupies in Las Vegas, Nevada; Beverly Hills, California; and Hawaii.

6. As all Ponzi schemes eventually do, the fraudulent enterprise perpetrated by Fujinaga and MRI collapsed. Since at least 2011, MRI has been in default on the payments it is obligated to pay investors. More than 8,000 people invested in MRI and, as of 2012, MRI's investments totaled approximately $813 million. Notwithstanding MRI's defaults to investors, this is an ongoing Ponzi scheme, in which Fujinaga and MRI have planned to make up their losses by enlisting new investors for the same treatment suffered by existing investors.

## THE PARTIES

7. The plaintiff is the Securities and Exchange Commission ("SEC"), which brings this action pursuant to the authority conferred on it by Securities Act Sections 20(b) and (c) and Exchange Act Sections 21(d) and (e) [15 U.S.C. §§ 77t(b) & (c), 78u(d) & (e)].

8. Defendant Edwin Yoshihiro Fujinaga, age 66, is a United States citizen and a resident of Las Vegas, Nevada. Fujinaga is the President, Chief Executive Officer, and sole owner of MRI. The corporate entities controlled by or affiliated with Fujinaga and MRI include

3

relief defendant CSA Service Center, LLC ("CSA"), and The Factoring Company. Fujinaga is the sole officer and owner of CSA and The Factoring Company.

9. Defendant MRI International, Inc. is a Nevada corporation formed on July 6, 1998, and headquartered in Las Vegas, Nevada. Notwithstanding its location in Nevada, in June 2008 MRI registered as a Type II Financial Instruments Business under Japanese finance laws.

10. Relief defendant CSA Service Center, LLC is a Nevada corporation controlled by MRI. The sole officer and owner of CSA is Fujinaga. CSA is the nominal owner of commercial real estate holdings that constitute proceeds of the illegal Ponzi scheme perpetrated by Fujinaga and MRI, as well as homes that Fujinaga occupies in Las Vegas, Nevada; Beverly Hills, California; and Hawaii.

## FACTS

### I. FUJINAGA AND MRI PERPETRATED A PONZI SCHEME ON INVESTORS.

11. Beginning in 1998 and continuing through 2013, Fujinaga and MRI solicited money from public investors living in Japan and other countries, such as Canada, Malaysia and New Zealand. They operated from Las Vegas, Nevada, with a sales office in Tokyo, Japan. Fujinaga and others hosted Japanese investors in the United States for solicitation presentations and tours of MRI's offices in Las Vegas.

12. The defendants told investors that they could invest in either U.S. dollars or Japanese yen, in amounts of $10,000, $50,000, or $100,000 (in the dollar-denominated plans) and ¥1.5 million, ¥7.5 million, or ¥15 million (in the yen-denominated plans). Depending on the size and duration of the investment, MRI promised returns ranging from 6 to 10.32 percent.

13. An investment in MRI was memorialized by a certificate of investment. MRI sent application forms to investors who expressed interest. Investors submitted applications to MRI

4

and received an investment agreement in return. To obtain a certificate of investment, investors either wired money or sent a check to one of two accounts at Wells Fargo Bank in Las Vegas. One account received money from investors in MRI's Select A Fund, and the other account received money from investors in MRI's Class A Fund.

14. Fujinaga and MRI retained LVT, Inc., doing business as Sterling Escrow, to administer the Select A and Class A accounts. Even though the defendants represented to investors that MRI used an escrow system to strictly safeguard the accounts, in reality Sterling Escrow did not provide escrow services but instead disbursed or transferred money into or out of the accounts solely at the direction of Fujinaga.

15. The promotional materials that MRI gave to investors were replete with false representations. A 2006 offering book for Select A represented as follows:

- "All funds are invested in MARS (Medical Accounts Receivables)."

- "The role of state governments. . . . Provides guarantees through deposit system."

- "What if MRI Inc. becomes insolvent? The escrow agent, with the intervention of the state government, will present MARS to other collection agencies to facilitate their collection, promising investors' funds."

- "In the event that an escrow agent should become insolvent, the structure is set up so that state governments guarantee reimbursement with funds received from escrow agents at deposits."

- "While state governments do not directly serve as intermediaries, strict state laws such as escrow agent approval, protections through deposit systems, and Life and Health Insurance Guaranty Association Act for medical accounts with insurance companies, provide backup for your important investment just in case."

5

- "By order of the escrow agent that is managing the funds, MARS are transferred as collateral to a lock box account in value that is equal or greater to the funds invested."

The offering book was signed by Fujinaga.

16. Contrary to these representations, all of the investor money was not invested in MARS. Beginning in 2010, Fujinaga instructed Sterling Escrow to disburse approximately 70 to 80 percent of the money that new investors transferred into the Select A and Class A accounts as principal and interest to prior investors. Fujinaga directed Sterling Escrow to use the investor money that remained to pay operational expenses and the payroll of MRI and entities that it controlled or with which it was affiliated. The Factoring Company received payments designated as phony "marketing fees" from MRI. Instead of marketing, The Factoring Company used money in its bank account to pay Fujinaga's personal credit card bills and to buy luxury cars for him. Fujinaga used money from The Factoring Company to pay alimony and child support of approximately $25,000 a month.

17. Contrary to the defendants' representations, state governments did not provide guarantees through the deposit system used by MRI. The State of Nevada did not have a program to reimburse investors for their losses in the Select A and Class A accounts. In the event of MRI's insolvency or that of the escrow agent, Nevada did not guarantee reimbursement of funds or provide that the escrow agent or state would serve as a collection agency or facilitate collection activity efforts. Neither the Nevada Division of Mortgage Lending, nor any other federal, state or local government authority, prevented, delayed or impeded Fujinaga or Sterling Escrow from disbursing money from the Select A and Class A accounts.

18. MRI made similar misrepresentations to individual investors. An employee of MRI told one investor that there was no risk, that invested principal was guaranteed, and that

there was no risk associated with exchange rate fluctuations, in particular. The manager of MRI's office in Tokyo walked a second investor through the 2006 offering book for Select A and stressed that investor money was protected by an independent escrow agent, lockbox accounts, and state government guarantees. The president of MRI's Tokyo office told a third investor that "money invested with MRI could be used only for buying MARS." He explained that, "even if MRI were to file for Chapter 11, the interest and principal would be protected up to the day before the filing." When MRI defaulted on interest payments to a fourth investor, company employees falsely told him that the delay was caused by an audit that the Japanese Financial Services Agency was conducting.

19. Contrary to MRI's representations to investors, the company's designated escrow agent, Sterling Escrow, did no more than administer the Select A and Class A Fund bank accounts, and disbursed or transferred funds from the accounts solely at the direction of defendant Fujinaga. Sterling Escrow exercised no independent authority over the accounts and did not place any restrictions or limitations on Fujinaga's authority to direct the use of those funds.

20. Fujinaga and MRI operated as a classic Ponzi scheme. Between January 2009 and March 2013, approximately $601 million of new and reinvested investor money was used to pay claims for principal or interest made by existing investors. These disbursements would lull investors into the false belief that MRI was operating as represented, when in fact it was not operating that way at all. In addition, MRI transferred at least $12.5 million to the bank account of Wells Fargo Securities and Bombardier Aerospace Corporation, where it was used to pay bills for non-MARS purchases. MRI did not use investor money solely for the purchase of MARS.

7

MRI stopped buying MARS from independent healthcare facilities in 2008. From 1998, MRI diverted investor money into its general and holding bank accounts.

21.     On July 26, 2012, Fujinaga wrote a confidential "status report of MRI's delinquencies with our investors" to other MRI officials. In that memorandum, Fujinaga proposed to resolve the delinquencies by doubling the amount of money raised from new investors: "I propose that we reinstate our consultants to fund raise for MRI to secure a larger base of consultants soliciting funds and possibly double the amount of funds raised on a monthly basis." Six weeks later, on September 13, 2012, Fujinaga represented the exact opposite to an investor, telling him that "[a]ll reinvested funds are deposited into a trust account with escrow and transferred only by escrow to purchase a set pool of MARS for a fixed period of time."

## II.     FUJINAGA AND MRI ATTEMPTED TO COVER THEIR TRACKS BY DESTROYING EVIDENCE.

22.     In March 2013, MRI received a letter from the SEC directing it not to destroy, eliminate or discard documents. Fujinaga received a copy of the letter. Several weeks later, a truck from the document shredding company Shred-It picked up boxes of documents from MRI. When Fujinaga's executive assistant made several telephone calls to prevent the pickup, Fujinaga called her and said, "Why are you concerned about this?" MRI fired the executive assistant because of her efforts to prevent the document destruction.

23.     On April 26, 2013, and based on the same misconduct by Fujinaga and MRI alleged in this complaint, the Japanese Securities and Exchange Surveillance Commission (the "SESC") recommended that the Prime Minister of Japan and the Commissioner of the Financial Services Agency take administrative action against MRI. The SESC found that, contrary to its representations that investor money would be separately managed through trust accounts, MRI's "own assets and the assets of Fund A and Fund B were commingled from at the latest 2011."

The SESC found that "from at the latest 2011, funds invested by customers for the purpose of acquiring Fund Equities were not used in the Business but were used to pay dividends and redemptions to other customers." MRI was found to have "stated figures that differed from the actual situation for the total assets" in business reports that the company submitted to the Director-General of the Kanto Local Finance Bureau.

24. The SESC found that "the Company has already prepared brochures and other solicitation materials for 2013 and planned to make solicitation for acquisition to many new customers." In an e-mail sent to investors on July 23, 2013, Fujinaga stated that "[w]e are engaging in the preparations to present certain evidences to overturn the Financial Services Agency's allegation that we had been engaged in fraud," indicating that the defendants intend to continue the Ponzi scheme.

25. The defendants did not cooperate in the SEC investigation of this matter. On March 19, 2013, the SEC served Fujinaga with a subpoena to appear for investigative testimony in Las Vegas on Monday, April 15. On the preceding weekend, counsel for Fujinaga requested that the SEC move the testimony to Friday, April 19, because of Fujinaga's purported fatigue and ill health. The SEC agreed. On the night before April 19, counsel e-mailed the SEC stating that Fujinaga would not appear for his rescheduled testimony because he had decided to change attorneys. Fujinaga never testified in the SEC investigation, and MRI did not produce documents as demanded by an SEC investigative subpoena.

26. Fujinaga is the sole officer and owner of relief defendant CSA Service Center, LLC ("CSA"). CSA holds nominal title to millions of dollars' worth of commercial and residential real estate for the benefit of Fujinaga. One of these parcels, Fujinaga's residence in Beverly Hills, California, is up for sale.

9

## FIRST CLAIM

### Fujinaga and MRI Violated Exchange Act Section 10(b) and Rule 10b-5.

27.     The Commission realleges paragraphs 1 through 26 above.

28.     Fujinaga and MRI each violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

29.     From approximately 2008 to the present, these defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

30.     The defendants' fraudulent scheme included, among other things, the following fraudulent devices, fraudulent acts, untrue statements of material fact, and material omissions:

   a.  The defendants operated a Ponzi scheme in which money from new investors, rather than being invested as represented, was paid out as principal and interest to prior investors;

   b.  The defendants represented to investors that all money would be invested in MARS, when in reality only a small portion, if any, of the money was so invested;

   c.  The defendants represented to investors that invested money would be maintained in escrow by an independent third-party, when in reality the agent, Sterling Escrow, did not provide escrow services and instead disbursed or transferred money solely at the discretion of Fujinaga;

   d.  The defendants represented to investors that state governments would, in the event of MRI's insolvency, present MARS to other

10

    collection agencies to facilitate their collection, when in reality Nevada had no such program;

 e. The defendants represented to investors that state governments would, in the event of the escrow agent's insolvency, guarantee reimbursement to investors, when in reality the State of Nevada did not guarantee such reimbursement; and

 f. The defendants represented to investors that they transferred an equal or greater dollar value of MARS as collateral into a lock box account to secure the money invested, when in reality no such matching of MARS collateral and investor money occurred.

## SECOND CLAIM

### Fujinaga and MRI Violated Securities Act Sections 17(a)(1), (2), and (3).

31. The Commission realleges paragraphs 1 through 30 above.

32. Fujinaga and MRI each violated Securities Act Sections 17(a)(1), (2), and (3) [15 U.S.C. §§ 77q(a)(1), (2) & (3)].

33. From approximately 2008 to the present, these defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the offer or sale of securities, and with knowledge, recklessness or negligence: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities being offered or sold.

34. The defendants' fraudulent scheme included, among other things, the following fraudulent devices, fraudulent acts, untrue statements of material fact, and material omissions:

11

a. The defendants operated a Ponzi scheme in which money from new investors, rather than being invested as represented, was paid out as principal and interest to prior investors;

b. The defendants represented to investors that all money would be invested in MARS, when in reality only a small portion, if any, of the money was so invested;

c. The defendants represented to investors that invested money would be maintained in escrow by an independent third-party, when in reality the agent, Sterling Escrow, did not provide escrow services and instead disbursed or transferred money solely at the discretion of Fujinaga;

d. The defendants represented to investors that state governments would, in the event of MRI's insolvency, present MARS to other collection agencies to facilitate their collection, when in reality Nevada had no such program;

e. The defendants represented to investors that state governments would, in the event of the escrow agent's insolvency, guarantee reimbursement to investors, when in reality the State of Nevada did not guarantee such reimbursement; and

f. The defendants represented to investors that they transferred an equal or greater dollar value of MARS as collateral into a lock box account to secure the money invested, when in reality no such matching of MARS collateral and investor money occurred.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that Fujinaga and MRI each violated the federal securities laws and Commission Rule as alleged in this Complaint;

### II.

Permanently enjoin Fujinaga and MRI from violating Securities Act Sections 17(a)(1), (2), and (3), Exchange Act Section 10(b), and Exchange Act Rule 10b-5;

12

### III.

Order Fujinaga, MRI, and CSA to disgorge all misappropriated investor funds and other ill-gotten gains that they obtained as a result of their fraudulent misstatements, acts or courses of conduct described in this Complaint, and to pay prejudgment interest thereon;

### IV.

Order Fujinaga and MRI each to file with the Court and serve on the Commission a sworn written accounting of all assets over which either defendant has ownership or control;

### V.

Order Fujinaga and MRI to pay civil monetary penalties pursuant to Securities Act Section 20(d) and Exchange Act Section 21(d)(3) [15 U.S.C. §§ 77t(d), 78u(d)(3)];

### VI.

Grant such equitable relief as may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)].

## **DEMAND FOR JURY TRIAL**

The Commission hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: Washington, D.C.
       September 11, 2013

                                                          /s/ Richard E. Simpson

Richard E. Simpson
Robert I. Dodge
Gerald W. Hodgkins
Gregory G. Faragasso
Danette R. Edwards
Thomas C. Swiers
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4492 (Simpson)
simpsonr@sec.gov