RICHARD E. SIMPSON
DAVID S. JOHNSON
DANETTE R. EDWARDS
THOMAS C. SWIERS
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
Telephone:  (202) 551-2218 (Johnson)
johnsonds@sec.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

_____

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

EDWIN YOSHIHIRO FUJINAGA and
MRI INTERNATIONAL, INC.,

Defendants,

and

CSA SERVICE CENTER, LLC,
THE FACTORING COMPANY,
JUNE FUJINAGA, and
THE YUNJU TRUST,

Relief Defendants.
_____

: Case No.:  2:13-cv-1658-JCM-CWH
:
:
:
:
: **THE SEC'S REPLY**
: **MEMORANDUM IN SUPPORT OF**
: **ITS MOTION FOR JUDGMENT**
: **AGAINST DEFENDANTS EDWIN**
: **FUJINAGA AND MRI**
: **INTERNATIONAL, INC.**
:
:
:
:
:
:
:
:
:

Plaintiff Securities and Exchange Commission ("SEC") hereby replies to the opposition

brief filed by Defendants Edwin Fujinaga and MRI International, Inc. (collectively,

"Defendants"), on the SEC's motion for judgment.  Contrary to Defendants' contentions, the

SEC has made a reasonable approximation of Defendants' illegal profits, as calculated by a

summary witness who, in contrast to an expert witness, added and subtracted numbers in

Defendants' own financial records and bank account statements.   For the reasons discussed below, the Court should grant the SEC's motion for judgment.

It is well-settled that, to prove a disgorgement figure, the SEC need only make a "reasonable approximation" of Defendants' profits; and the Court is "not required to trace every dollar . . . fraudulently retained by" Defendants.  *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998).  Defendants concede that, "[i]f this approximation appears []reasonable, *defendants bear the burden* of proving a more reasonable figure."  Defs.' Opp. Br. at 5 (emphasis added).  As the Ninth Circuit reasoned in *SEC v. CMKM Diamonds, Inc.*, Defendants bear this burden because they "'are more likely than the SEC to have access to evidence establishing what they paid for the securities, if anything, to whom the proceeds from the sales were distributed, and for what purposes the proceeds were used.'"  729 F.3d 1248, 1261 (9th Cir. 2013) (quoting *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010)).

A.      **The SEC's Staff Accountant is a Summary Witness, Not an Expert Witness**

The SEC clearly has demonstrated, at a minimum, a reasonable approximation of Defendants' ill-gotten gains.   The SEC's disgorgement figure – $442,339,611.70 – was calculated using *Defendants' own* balance sheet and bank account statements.   The SEC submitted to the Court a declaration from one of its staff accountants, Colin Rand, to explain the calculations that the SEC made to reach this number.[1]  Defendants contend that this declaration somehow constitutes expert testimony and should not be considered by the Court.  However, Mr. Rand merely performed a mathematical calculation of Defendants' financial records; notably, he did not express any opinions based on scientific, technical, or specialized knowledge.  *See* Fed.

---

[1] The SEC routinely uses its staff accountants as summary witnesses to calculate the amount of illegal profits.  *See, e.g., SEC v. Blackwell*, Case No. 3:11-cv-234-L., 2012 WL 13564, at *3 (Jan. 4, 2012).

R. Evid. 702.  If Mr. Rand were presenting an expert opinion, one would expect him to base his opinion on Generally Accepted Accounting Principles or Generally Accepted Auditing Standards.  Not so here:  Mr. Rand served in a non-expert capacity, as a summary witness to summarize and calculate the numbers in Defendants' financial records to arrive at a reasonable approximation of Defendants' illegal profits and compute the amount of prejudgment interest.[2] A person is a summary witness, not an expert, when all he does is review financial records and make calculations from them.  *See United States v. Ransfer*, 749 F.3d 914, 938 (11th Cir. 2014) (government witness's testimony was summary instead of expert testimony "because it was a summary of financial records the witness reviewed and an explanation of how the summary was calculated"); *United States v. Hevener*, 382 F. Supp. 2d 719, 730 (E.D. Pa. 2005) (government witness was a summary witness because he merely "created charts and summaries based on Defendant's financial statements and records").  *Accord SEC v. Eldridge*, Case No. 1:05-cv-735-CC, 2007 WL 7654404, at *3 n. 16 (N.D. Ga. Mar. 20, 2007) (same).

**B.**     **Defendants Should Disgorge Their Illegal Profits from *All* of the Investors**

Defendants claim that the SEC's disgorgement approximation is unreasonable because the SEC alleged in its amended complaint "that the causes of action occurred 'From approximately 2008 to the present' . . . [and therefore] this Court would be granting the SEC damages for conduct not alleged in the SEC's own causes of action."  Defs.' Opp. Br. at 7.  The amended complaint, however, included the important qualifier "approximately" before "2008" to indicate that the fraudulent conduct was not limited to 2008.  Moreover, the SEC specifically alleged in the amended complaint, under the heading "Summary of Allegations," that "[f]rom *October 1998* through May 2013, MRI received over $800 million from investors."  Am. Compl.

---

[2] The Court and Defendants can arrive at the same figures – independent of Mr. Rand's summary declaration – by reviewing the underlying financial records and making their own calculations.

¶ 4 (ECF No. 118) (emphasis added).  The SEC also specifically alleged in the amended complaint that Defendants made numerous false representations in MRI's *2006* offering book. *Id.* ¶ 18.  Indeed, the Court discussed false representations in the 2006 offering book in its order finding Defendants liable in this case.  Oct. 3, 2014, Order at 3, 14 (ECF No. 156).  Defendants' argument that the amended complaint does not encompass fraudulent conduct prior to 2008 is simply wrong.

Even if the SEC were limited to fraudulent conduct beginning precisely on January 1, 2008, Defendants' Ponzi scheme involved and impacted the funds that Defendants possessed as of that date.  The Court noted in its order granting summary judgment on liability in favor of the SEC that Defendant Fujinaga "us[ed investment funds] for his own personal benefit.  *While depleting the pool of collected investments*, Fujinaga facilitated a Ponzi scheme funded by new investments."  *Id.* at 14 (emphasis added).  As alleged in the amended complaint, "[b]y May 2013, the two bank accounts that MRI maintained for the benefit of investors had balances of zero."  Am. Compl. ¶ 7 (ECF No. 118).

And, even if the amended complaint did not allege fraudulent conduct prior to 2008, it is clear that Defendants continued defrauding the pre-2008 investors after taking their initial investment money.  From 2008 through 2013, MRI incurred annual increases of tens of millions of dollars to its retained deficit, lost money each year, and continued to use the investors' money, not for the purchase of medical accounts receivable, but to fund Defendant Fujinaga's other businesses and pay for his extravagant personal expenses.  None of this was disclosed to the pre-2008 investors.  Thus, the amended complaint alleged:

> From 2008 to 2013, the defendants maintained *existing investors* in ignorance by not disclosing to them that MRI had a retained deficit of hundreds of millions of dollars, that MRI lost money each year in that period, and that MRI's investment

> in MARs (purchased principally or totally from entities affiliated with Fujinaga) was dwarfed by the hundreds of millions of dollars that MRI loaned, principally or totally, to entities affiliated with Fujinaga[.]

Am. Compl. ¶¶ 39(h), 43(h) (ECF No. 118) (emphasis added).

Furthermore, from 2008 through 2013, Defendants lulled the pre-2008 investors into a false sense of security by sending them bogus account statements that merely added up the amount of principal and interest the investors were owed, without any disclosure of how much the investors' investments were really worth.  Thus, the amended complaint alleged:

> From 2008 to 2013, the defendants sent false quarterly account statements to *existing investors* which merely added up the principal and interest owed to each investor under the terms of the investment without providing the investors with any indication that MRI had a retained earnings deficit of hundreds of millions of dollars, that MRI lost money in each year in that period, or that the value of each investor's investment was nowhere near what was being represented in the account statement.

Am. Compl. ¶¶ 39(i), 43(i) (ECF No. 118) (emphasis added).

Similarly, from 2008 through 2013, Defendants lulled the pre-2008 investors into a false sense of security by paying them the interest they were owed with money that Defendants obtained from new investors.  Thus, the amended complaint alleged that "[t]he defendants operated a Ponzi scheme in which money from new investors, rather than being invested as represented, was paid out as principal and interest to prior investors[.]"  Am. Compl. ¶¶ 39(a), 43(a).  By keeping the pre-2008 investors happy with money from new investors, Defendants were able to continue their fraudulent Ponzi scheme throughout the period from 2008 to 2013.

All of these facts from 2008 through 2013 – Defendants' failure to disclose MRI's annual losses and wretched financial condition, their mailing of account statements that told the investors nothing but falsehoods, and the use of new investor money to pay existing investors – would have been material to the pre-2008 investors as they decided, in the period from 2008

through 2013, whether to liquidate their investments or reinvest in Defendants' undisclosed Ponzi scheme.  In fact, in making their reinvestment decision, the pre-2008 investors were surely exposed, from 2008 through 2013, to Defendants' continual misrepresentations about the use of the investors' money, the safety of their investments, and the financial condition and profitability of MRI.  Thus, to suggest, as Defendants do, that the fraud on the pre-2008 investors "pre-dates" the scope of the amended complaint is to misread that document and ignore the manner in which their own Ponzi scheme continued to defraud all the investors from 2008 to 2013.

**C.**     **The Court Should Draw an Adverse Inference from Defendant Fujinaga's Refusal to Answer Questions**

Further bolstering the reasonableness of the SEC's approximation of a disgorgement figure – and the unreasonableness of Defendants' proposed amount of $200,517,501.80 – is the adverse inference that the Court should draw in light of Defendant Fujinaga's refusal to answer numerous questions on this issue.  The SEC had the right to discover information from Defendants about their illegal profits.  Defendant Fujinaga's refusal to answer questions during his deposition prevented the SEC from obtaining this information.  *See* Pl.'s Mot. for Summ. J. on Liability at 19-20 (ECF No. 113-1) (listing, as examples, nine questions posed by the SEC). The Court can and should infer that such information would have supported the SEC's position (and potentially increased the disgorgement figure).

In fact, it is surprising that Defendants attempt to take the SEC to task for referring to different numbers for Defendants' illegal profits over the course of this action, when Defendant Fujinaga himself has used different numbers and invoked the Fifth Amendment to block the SEC from discovering the basis for those numbers.  In his deposition, Defendant Fujinaga asserted that the amount of illegal profits was not $200 million, but $250 million (a 25% increase from his current number):

Q.  How much does MRI owe its investors?

A.  250 mil.

Q.  And what's your factual basis for saying that MRI owes its investors $250 million?

A.  Bank wires, bank statements, tax returns, everything.

Q.  Is there a balance sheet anywhere that reflects that MRI owes its investors $250 million?

A.  In this proceeding?  You mean, did I bring it with me?  What are you asking?

Q.  Is there in existence somewhere in the world a balance sheet that reflects that MRI owes its investors $250 million?

A.  Yes.

Q.  And has that balance sheet been produced to the SEC?

A.  No.

Q.  Why hasn't it been produced to the SEC?

A.  My lawyers handle that.

Edwin Fujinaga Dep., appearing in Appendix to Pl.'s Mot for Summ. J. on Liability at

A003-004 (ECF No. 113-4).

Three minutes later, Fujinaga took refuge in the Fifth Amendment:

Q.  . . . how much in principal does MRI owe its investors?

A.  Principal?  I can't answer that using the Fifth.

Q.  Fifth Amendment?

A.  Correct.

Q.  How much in interest does MRI owe its investors?

A.  Repeat the question.

Q.  How much in accrued interest does MRI owe its investors?

A.  Don't know.  I have to look it up.

Q.  Is there a balance sheet that shows how much MRI owes its investors?

A.  I would say yes, but, you know, I won't elaborate in this deposition.  I'm going to plead the Fifth on that, too.

*Id*. at A007-0008.

In light of this testimony, Defendant Fujinaga is in no position to submit to this Court a declaration averring how much Defendants owe the investors.

Because the SEC's approximation of illegal profits is reasonable, the burden shifted to Defendants to prove a more accurate number.  But, as described above, Defendant Fujinaga's disgorgement number in his current declaration is different from that in his sworn testimony on the same issue, and Fujinaga invoked the Fifth Amendment to block cross-examination. Moreover, his declaration is utterly devoid of detail.  Under these circumstances, the declaration does not meet Defendants' burden of proof, and the SEC's disgorgement number controls.  *See SEC v. First City Financial Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)(defendants failed to meet their burden of proving a more accurate disgorgement number even though they used "a sophisticated expert witness").

D.      **Defendants' Remaining Arguments Are Unavailing**

Defendants' remaining arguments do not help them avoid the remedies sought by the SEC.  The calculation of prejudgment interest is based on a reasonable approximation of Defendants' ill-gotten gains and contains offsets to account for funds that were paid to investors. Joint and several liability for Defendants is appropriate in this case, particularly when the Court already ruled that "defendant Fujinaga had sole control over investment funds, using them for his own personal benefit."  Oct. 3, 2014, Order at 14 (ECF No. 156).  In addition, Defendants did not dispute the SEC's statement that "Defendant Edwin Fujinaga was the Chief Executive

Officer, a founder, and sole owner of MRI International, Inc." in the SEC's Statement of Material Facts Not Genuinely in Dispute in Support of Its Motion for Summary Judgment on Liability.  Pl.'s Stmt. of Mat. Facts Not Gen. in Disp. ¶ 1 (ECF No. 113-2); Defs.' Stmt. Pur. to LR 56-1 ¶ 1 (ECF No. 136).  Finally, the civil penalty requested is more than reasonable, in light of the egregious conduct.  Defendants defrauded thousands of innocent investors, causing them to lose hundreds of millions of dollars, while Defendant Fujinaga drove fancy cars and lived in mansions.  A substantial judgment – including disgorgement, prejudgment interest, penalties, and injunctive relief – is warranted.

## CONCLUSION

For the reasons stated here and in its motion, the SEC respectfully requests that the Court enter Final Judgment against Defendants Edwin Fujinaga and MRI International, Inc. in the form submitted by the SEC.

Dated:  Washington, D.C.                                   Respectfully submitted,
        December 24, 2014

/s/ *David S. Johnson*
Richard E. Simpson
David S. Johnson
Danette R. Edwards
Thomas C. Swiers
Attorneys for Plaintiff
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-2218 (Johnson)
johnsonds@sec.gov

## CERTIFICATE OF SERVICE

I certify that on December 24, 2014, I served defense counsel identified below with the foregoing reply brief via the Court's ECF system:

Daniel L. Hitzke
Hitzke & Associates
100 Oceangate
Suite No. 1100
Long Beach, California 90802
Daniel.hitzke@ahlaw.net
Attorney for Defendants and Relief Defendants CSA Service Center, LLC, and The Factoring Co.

Erick M. Ferran
Hitzke & Associates
2030 East Flamingo Road
Suite No. 115
Las Vegas, Nevada 89119
Erick.ferran@ahlaw.net
Attorney for Defendants and Relief Defendants CSA Service Center, LLC, and The Factoring Co.

Johnny L. Griffin, III
1010 F Street
Suite No. 200
Sacramento, California 95814
jgriffin@johnnygriffinlaw.com
Attorney for Relief Defendants June Fujinaga and The Yunju Trust

/s/ *Richard Simpson*
Richard Simpson

10