UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff(s),<br><br>v.<br><br>EDWIN YOSHIHIRO FUJINAGA and MRI INTERNATIONAL, INC., et al.,<br><br>Defendant(s). | Case No. 2:13-CV-1658 JCM (CWH)<br><br>ORDER |

Presently before the court is Rob Evans & Associates LLC's ("the receiver") motion for order to show cause why former counsel for defendant should not be compelled to return estate funds. (ECF No. 556). Clark Hill, PLLC[1] ("the firm") filed a response (ECF No. 568).

**I.      Background**

The parties are familiar with the facts of the underlying case, so the court recites them only as necessary for the adjudication of the instant motion. Defendants Edwin Fujinaga, Yunju Fujinaga's ("June") husband, and MRI International, Inc. obtained hundreds of millions of dollars from investors by operating a fraudulent Ponzi scheme. The Securities Exchange Commission ("SEC") filed the instant action to recover those funds.

As relevant to this motion, the court entered a temporary restraining order ("TRO") and preliminary injunction in September and October 2013, respectively, which ordered as follows:

> Defendants and Relief Defendant CSA Service Center, LLC, and their officers, agents, servants, employees, family members, attorneys, and those persons in active concert or participation with

---

[1] Clark Hill, PLLC acquired Gentile Cristalli Miller Armeni & Savarese, which represented relief defendants June Fujinaga and the Yunju Trust.

**James C. Mahan**
**U.S. District Judge**

> them who receive actual notice of this Order by personal service or otherwise, and each of them, shall hold and retain within their control, and otherwise prevent any direct or indirect withdrawal, disposition, sale, transfer, pledge, hypothecation, changing, wasting, encumbrance, assignment, dissipation, conversion, concealment, or other disposal whatsoever of any funds, assets, securities, or other real or personal property, wherever located, of Defendants and Relief Defendant, and their subsidiaries and affiliates, whether owned by, controlled by, managed by or in the possession or custody of any of them, including assets held in business, corporate or partnership accounts in which Defendants and Relief Defendant have an interest, except as otherwise ordered by the Court.

(ECF Nos. 10; 20). The SEC named June and the Yunju Trust as "relief defendants" in its first amended complaint on July 24, 2014. (ECF No. 118). The court granted summary judgment as to the primary defendants' liability on October 3, 2014. (ECF No. 156).

On February 23, 2015, after thorough briefing and a hearing on the issue, (*see* ECF Nos. 145; 153; 155; 170; 174; 175; 176; 180; 181; 182; 183; 186; 187; 192), the court appointed the receiver in a limited capacity (ECF Nos. 193; 194). On May 15, 2015, the court appointed the receiver as a full equitable receiver and instructed it to assume control over the defendants' assets. (ECF No. 226).

Roughly two months later, on July 29, 2015, the court granted summary judgment against June and the Yunju Trust. (ECF No. 253). The court found that June received fund from Edwin and that June was not entitled to the funds. *Id.* Notably, June did not dispute the SEC's statement of material facts, including the allegation that she received $2.3 million in stolen funds from the primary defendants. (*See* ECF Nos. 219; 230). The court entered judgment against June and the Yunju Trust on August 11, 2015, (ECF No. 260), and an amended final judgment on March 24, 2016, (ECF No. 317).

June and the Yunju Trust retained and agreed to pay the firm $100,000 "for the purpose of challenging the summary judgment disgorgement against them[.]"  (ECF No. 557 at 8, 12); (*see* ECF Nos. 249 (Mr. Gentile's notice of appearance on July 27, 2015); 255 (prior counsel, Mr. Griffin, moved to withdraw); 262 (Mr. Cristalli's notice of appearance on August 26, 2015); 265 (order granting Mr. Griffin's motion to withdraw)). June made three payments to the firm from her Wells Fargo Account (XXXX2913): a $30,000 check on July 22, 2015; a $30,000 check on

**James C. Mahan**
**U.S. District Judge**

August 7, 2015; and a $40,000 cashier's check on October 5, 2015.  (ECF Nos. 556 at 12; 557 at 14–16; 568 at 4).

June made all three payments to the firm after this court issued the preliminary injunction.  The first payment occurred after June and the Yunju Trust were named as relief defendants, but before summary judgment was granted against them.  June made the second payment after summary judgment, while the receiver was a full equitable receiver, but before judgment was entered.  Finally, the firm received the last payment after initial judgment was entered against June and the Yunju Trust but before the court entered the amended final judgment.

The receiver inquired about the source of the $100,000 used to pay the firm on February 15, 2017.  (ECF Nos. 568 at 4; 568-1).  On April 23, 2019, the receiver demanded that the firm return the $100,000, arguing that the money "belonged and belongs to the receivership estate."  (ECF Nos. 557 at 3; 568 at 5).  The firm responded, arguing that the money was not subject to the court's preliminary injunction.  (ECF Nos. 568 at 5; 568-2).

The receiver sent another demand letter and, when the firm refused to return of the $100,000, the instant motion followed.  (ECF Nos. 556; 568 at 5; 568-3).

## II.   Legal Standard

"Under traditional principles of equity practice, courts have long imposed civil contempt sanctions to 'coerce the defendant into compliance' with an injunction or 'compensate the complainant for losses' stemming from the defendant's noncompliance with an injunction." *Taggart v. Lorenzen*, ____ U.S. ____, 139 S. Ct. 1795, 1801 (2019) (quoting *United States v. Mine Workers*, 330 U.S. 258, 303–04 (1947)).  "[C]ivil contempt sanctions . . . may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard.  Neither a jury trial nor proof beyond a reasonable doubt is required." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).

The Supreme Court has recognized that "civil contempt is a 'severe remedy.'" *Taggart*, 139 S. Ct. at 1802 (quoting *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).  Thus, although "[t]he absence of willfulness does not relieve from civil contempt," *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949), "principles of 'basic fairness

require that those enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt," *Taggart*, 139 S. Ct. at 1802 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) (*per curiam*)).  If the contemnor has sufficient notice that his or her conduct is prohibited, the standard for civil contempt "is generally an *objective* one." *Taggart*, 139 S. Ct. at 1802.  The Supreme Court "ha[s] explained before that a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Id.*  Put another way, "[s]ince the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act." *McComb*, 336 U.S. 187, 191 (1949).

Procedurally, "[t]he moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *In re Dyer*, 322 F.3d 1178, 1190–91 (9th Cir. 2003) (citation and quotation marks omitted).  If the moving party meets its burden, the contemnors must "demonstrate why they were unable to comply." *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992) (citing *Donovan v. Mazzola (Donovan II),* 716 F.2d 1226, 1240 (9th Cir.1983), *cert. denied,* 464 U.S. 1040 (1984)).  This requires the contemnor to show it "took every reasonable step to comply." *Id.* (citing *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976)).

### III.     Discussion

The receiver argues that the payments to the firm "were paid and received: (A) during the pendency of this receivership, (B) in violation of this Court's Asset Freeze Order, (C) in violation of the Order Appointing Receiver, and (D) in the face of overwhelming evidence that June Fujinaga had received over $2.3 million in stolen funds." (ECF No. 556 at 11).  The receiver does not expressly allege that the money in June's Wells Fargo account came from Edwin or MRI but does so by implication: "[the firm] either knew they were being paid with stolen funds or they were intentionally ignorant of that fact." *Id.*  By the receiver's estimation, "it was beyond any reasonable argument that *any funds in June Fujinaga's possession were stolen funds* subject to this [c]ourt's disgorgement judgment and property of the estate." *Id.* at 17 (emphasis added).

James C. Mahan
U.S. District Judge

- 4 -

In response, the firm argues that June's assets were not subject to the court's preliminary injunction. (ECF No. 568 at 6–7). The firm contends that "[a]t no time . . . has the SEC or the [r]eceiver or any other person or entity argued to the [c]ourt, filed any motion with the [c]ourt and/or provided any evidence to the [c]ourt that the funds in June Fujinaga's WF XXXX2913 . . . belonged to or were controlled by Edwin Fujinaga, MRI International and/or CSA Service Center."[2] *Id.* at 8. Thus, the firm concludes that, "[i]n the absence of any finding that the funds possessed by Mrs. Fujinaga that were used to pay [the firm] for its legal services belonged to or were controlled by Edwin Fujinaga, no violation of the [preliminary injunction] could occur." *Id.*

The Ninth Circuit's holding in *F.T.C. v. Network Servs. Depot, Inc.,* 617 F.3d 1127 (9th Cir. 2010), is instructive. In *Network Servs.*, the court noted that "[a]n attorney is an 'officer of the court' who, by virtue of his or her professional position, undertakes certain 'special duties . . . to avoid conduct that undermines the integrity of the adjudicative process.'" *Id.* at 1143 (citing ABA MODEL RULES, Rule 3.3, cmt. 2). The Ninth Circuit unambiguously held that these special duties meant that "an attorney is not permitted to be willfully ignorant of how his fees are paid." *Id.* at 1144.

There, Benice, an attorney, represented a defendant, Castro, who the court found liable "making material misrepresentations and engaging in deceptive business practices" in violation of federal law. *Id.* at 1130. The district court found Castro paid Benice with funds that derived from Castro's unlawful activity based on the following evidence:

> Using several methods of analysis, FTC financial expert Kenneth Kelley determined that all of the funds withdrawn from the custodial accounts and used to pay Benice could be traced to NSD and the other Castro companies. According to Kelley's analysis, 90 percent of the funds were traceable to NSD's accounts and revenue from the kiosk scheme. The remaining funds were all attributable to at least one of the Castro companies, but because those entities regularly transferred money to one another and paid each others' expenses, Kelley could not state conclusively which company initially generated the funds.

---

[2] CSA Service Center was named as another relief defendant. (ECF No. 118).

James C. Mahan
U.S. District Judge

- 5 -

*Id.* at 1142.  Notably, the funds "were not yet subject to an asset freeze at the time of the fee arrangement." *Id.* at 1144.  Nonetheless, the court held Benice in civil contempt and imposed a constructive trust over a portion of the fees.  *Id.* at 1131, 1145.

On appeal, the Ninth Circuit held that "the record clearly demonstrate[d] sufficient facts to trigger Benice's duty of inquiry as to the source of the funds." *Id.* at 1144.  Benice argued that he relied on Castro's representations and concluded "that the money used to pay his fee came not from the alleged violations of the FTC Act but from Castro's legitimate business activities." *Id.*  But Benice was aware of the FTC's draft complaint—which had not yet been filed—and "other materials," which the Ninth Circuit held "should have cast doubt on the reliability of Castro's statements." *Id.*  The Ninth Circuit further held as follows:

> A diligent review of the circumstances—such as the one Benice claims to have undertaken—would also have revealed what claims were asserted against Appellants and which of Appellants' assets were likely subject to disgorgement if the FTC prevailed on those claims. In light of the FTC's allegations that the custodial funds were derived from a fraudulent scheme, Benice could not sufficiently discharge his duty of inquiry merely by relying on the contrary representations of his client.

*Id.* at 1144–45.

The record in this case clearly demonstrated sufficient facts to trigger the firm's duty to inquire as to the source of the funds.  Unlike the attorney in *Network Servs.*, who was retained prior to the FTC filing its complaint against his client, June and the Yunju Trust retained and paid the firm after nearly two years of ongoing litigation.  By the time the firm appeared in this case, the court had already entered its injunction and granted summary judgment as to liability against Edwin and MRI.  (ECF Nos. 20; 156).  Mr. Gentile appeared just two days before this court granted summary judgment against June and the Yunju Trust.  (*See* ECF Nos. 249; 253).  Mr. Cristalli appeared two weeks after the court entered judgment against them.  (*See* ECF Nos. 260; 262).

The firm does not contend that it did any investigation into the source of the funds June used to pay her legal fees.  (*See* ECF No. 568).  Unlike the *Network Servs.* court, this court is unable to determine how June acquired the funds in her Wells Fargo account from the record before it, due in large part to June's conduct.  After stating her name for the record, June invoked

James C. Mahan
U.S. District Judge

- 6 -

her confidential marital and Fifth Amendment privileges in response to every one of the over 700 questions asked in her deposition. (ECF No. 219-8). The firm—cloaked with the attorney-client privilege—was in the best, and perhaps only, position to inquire about the source of the funds. It failed to do so. Instead, it accepted $100,000 from its client and chose to remain willfully ignorant of its source, despite the evidence in the record that the funds were proceeds of the underlying Ponzi scheme.

Thus, the court finds clear and convincing that the firm failed to comply with this court's preliminary injunction by accepting the $100,000 payment without verifying its source. *See Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1105 (9th Cir. 1992), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ("Clear and convincing evidence means evidence sufficient to support a finding of 'high probability.'"). The firm has failed to show that it took any step—let alone "every reasonable step"—to comply. *See Stone*, 968 F.2d at 856 n.9.

Accordingly, the court grants the receiver's motion. The court orders the parties to appear for a show cause hearing, at which time they should be prepared to discuss the source of the funds in June's Wells Fargo account (XXXX2913).

**IV.   Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the receiver's motion for order to show cause why former counsel for defendant should not be compelled to return estate funds (ECF No. 556) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that the parties shall appear in the United States District Court, Courtroom 6A, on **Tuesday, June 30, 2020, at 11:30 a.m.** to show cause why the firm should not be held in contempt. The court has set aside one hour for this hearing.

IT IS FURTHER ORDERED that failure to appear and show cause will result in sanctions.

DATED June 8, 2020.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**

- 7 -